IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

TINA M. DUFF, et al.,                    §
                                         §
                        Plaintiffs,      §
                                         §   Civil Action No. 3:12-CV-1679-D
VS.                                      §
                                         §
FARMERS INSURANCE EXCHANGE,              §
                                         §
                        Defendant.       §

MEMORANDUM OPINION
AND ORDER

        In this action alleging age discrimination, in violation of the Age Discrimination in

Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Texas Commission on

Human Rights Act ("TCHRA"), Tex. Labor Code Ann. § 21.001 *et seq.* (West 2006), the

court must determine whether plaintiffs' ADEA claim is timely and whether plaintiffs have

raised a genuine issue of material fact on either claim.  Concluding that plaintiffs' ADEA

claim is timely but that they have failed to raise a genuine issue of material fact on either

claim, the court grants defendant's motion for summary judgment and dismisses this action

with prejudice by judgment filed today.[1]

---

        [1]Some of the summary judgment evidence on which the court relies has been filed
under seal pursuant to the terms of the stipulated protective order entered in this case.
Having considered the evidence that is cited in this memorandum opinion and order, the
terms of the stipulated protective order, and the public nature of this proceeding, the court
concludes that this memorandum opinion and order should not be filed under seal even
though in some instances the court refers to and/or cites evidence that was submitted under
seal.

I

Plaintiffs Tina Duff ("Duff") and Patty Samuelson ("Samuelson") began working for defendant Farmers Insurance Exchange ("Farmers") in the mid-1980s and were terminated in April 2011.[2] At the time of Duff's termination on April 20, 2011, she was approximately 51 years old. At the time of Samuelson's termination on April 15, 2011, she was approximately 55 years old. Duff was a Special Claims Representative (salary grade 33), and Samuelson was a Senior Claims Representative (salary grade 32). They were both working at the Med/PIP[3] branch claims office in Arlington, Texas. From 2006 until her termination, Duff was supervised by Sherri Flannery ("Flannery"). From the beginning of 2010 to the fourth fiscal quarter of 2010, Samuelson was supervised by Victoria Benoit ("Benoit"). From the fourth fiscal quarter of 2010 until her termination, she was supervised by Sherry Davis-Peace ("Davis-Peace").

In April 2010—one year before plaintiffs' terminations—David Hemry ("Hemry") assumed the role of office manager at the Arlington Med/PIP office and began making changes to the structure of the office. In particular, he created three specialized groups of claims representatives: (1) "TNT," (2) "RLE," and (3) "Floor." The TNT group, which

_____

[2]In deciding this motion, the court views the evidence in the light most favorable to plaintiffs as the summary judgment nonmovants and draws all reasonable inferences in their favor. *See, e.g., Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).

[3]"Med" stands for "medical," and "PIP" is an abbreviation for "Personal Injury Protection," which refers to a particular type of insurance coverage.

- 2 -

stands for "tech-no-touch," handled the least complicated claims.  The RLE group, which stands for "represented low-exposure," handled relatively simple claims where the client was represented by an attorney.  The Floor group handled the remaining claims, which were generally more complicated than the claims handled by the TNT or RLE group.  Plaintiffs, as experienced claims representatives, were both assigned to the Floor group.

In addition to changing the structure of the office, Hemry also altered how claims representatives were evaluated.  Before Hemry began managing the Arlington office, all claims representatives were evaluated on the basis of five criteria: (1) Customer Service, (2) Total File Quality ("TFQ"), (3) Medicare Compliance, (4) Level of Support, and (5) Behavior.  The first three criteria were measured on a 1-to-5 scoring system: 1-Below Expectations, 2-Partially Meets Expectations, 3-Meets Expectations, 4-Exceeds Expectations, and 5-Far Exceeds Expectations.  The last two criteria were based on written comments, not numerical scores.  When Hemry joined the office, he implemented a policy known as "Higher Standards," which added a numerical component to the fourth and fifth criteria.  Under this policy, a claims representative could not receive a Meets Expectations score (3) for her total score if she received a score below Meets Expectations (3) on any of the five evaluation criteria.  For example, if a claims representative scored a Far Exceeds Expectations score (5) on four out of five categories but a Partially Meets Expectations (2) in one category, her total score could not be higher than a Partially Meets Expectations (2).

Hemry also discontinued the practice that a direct supervisor could positively adjust a claims representative's performance evaluation because of extenuating circumstances.  For

example, a claims representative's Customer Service score was based on client responses to customer service surveys. Although a claims representative typically handled hundreds of claims per year, she would only receive approximately 10-15 surveys per year. The low response rate meant that a single negative review could cause a claims representative to fail a specified Customer Service objective for the year. Prior to Hemry's arrival, if a direct supervisor determined that the average Customer Service score based on returned surveys was unrepresentative of the claims representative's actual performance, she could adjust the Customer Service score upward. Once Hemry implemented the Higher Standards program, supervisors lost this discretionary power.

Not all of the changes that Hemry introduced applied or affected the three groups of claims representatives in the same way. For example, claims representatives in the TNT group were not individually evaluated for their customer service. Instead, the group was given one Customer Service score based on the unit's collective performance. Claims representatives in the RLE group were not given a Customer Service score—individually or collectively—at all; instead, they were given an "evaluation score" based on their proficiency in handling claims.

The rules governing workload distribution also applied to the three groups in different ways. The total volume of claims being submitted to the RLE group was capped, and the TNT group received help from members of other teams when it experienced an overflow of work. The Floor group neither had a cap in place nor received help from members of other teams when it experienced a work overflow.

During the period leading up to plaintiffs' terminations, Farmers used an automated system for distributing claims among members of the Floor group. A computer program—the "Assignment Manager"—assigned approximately five claims per day to each claims representative in the group, unless the representative was out of the office for vacation or illness. The Assignment Manager assigned zero claims to absent representatives on the day they were out of the office, but when they returned, it would assign them five claims for each day they had been out. For example, if a claims representative was out of the office on Monday and Tuesday, she would be assigned zero claims on those days, but when she returned on Wednesday, she would be assigned fifteen claims rather than five. In reality, a claims representative was never actually taken off claims, and the more a claims representative was out of the office, the higher her daily volume of work would be when she returned.

Farmers noted performance problems with Duff during 2009, 2010, and 2011, and with Samuelson during 2010 and early 2011. On her 2008 year-end review, Duff received all Far Exceeds Expectations scores (Customer Service, TFQ, and Medicare Compliance) and a Total Score of Far Exceeds Expectations. On her 2009 year-end review, she received two Far Exceeds Expectations scores (TFQ and Medicare Compliance), one Below Expectations score (Customer Service),[4] and a total score of Meets Expectations.[5]

---

[4]In their brief, plaintiffs state that Duff received a Customer Service score of Meets Expectations on her 2009 year-end review. Ps. Br. 13. This statement is not supported by competent summary judgment evidence. Plaintiffs cite to a copy of her 2009 year-end review, which states that Duff received a Below Expectations score for Customer Service.

Her performance scores on the 2010 mid-year and 2010 year-end evaluations dropped.  On her 2010 mid-year evaluation, Duff received one Exceeds Expectations score (TFQ), four Meets Expectations scores (Customer Service, Medicare Compliance, Level of Support, and Behavior), and a total score of Meets Expectations.  Her 2010 year-end evaluation was worse.  She received one Exceeds Expectations score (TFQ), one Meets Expectations score (Medicare Compliance), three Partially Meets Expectations scores (Customer Service, Level of Support, and Behavior), and a total score of Partially Meets Expectations.

Samuelson's performance reviews reflect a similar decline in performance during the period immediately prior to her termination.  On her 2009 year-end review, she received three Far Exceeds Expectations scores (Customer Service, TFQ, and Medicare Compliance) and a total score of Far Exceeds Expectations.  On her 2010 year-end review, she received one Meets Expectations score (Medicare Compliance), three Partially Meets Expectations scores (Customer Service, Level of Support, and Behavior), one Below Expectations score (TFQ), and a total score of Below Expectations.[6]

_____

Ps. App. 109.  Farmers highlights this discrepancy in its reply brief and attaches another copy of the 2009 year-end review, which also states that Duff received a Below Expectations score for Customer Service.  D. Sealed App. 2.

[5]Plaintiffs assert that Duff received a total score of Far Exceeds Expectations on her 2009 year-end review.  Ps. Br. 13.  This statement is not supported by competent summary judgment evidence.  Plaintiffs cite a copy of her 2009 year-end review that states that Duff received a Meets Expectations overall rating.  Ps. App. 115.  Farmers' copy of the 2009 year-end review likewise states that Duff received a Meets Expectations overall rating.  D. Sealed App. 8.

[6]Plaintiffs present Samuelson's mid-year 2010 performance review as well, but it does not include scores for three of the criteria.  Generally speaking, the review is more negative

During 2010 plaintiffs complained to their direct supervisors and to Hemry about the workload distribution and the new evaluation system.  In particular, plaintiffs complained that Farmers' vacation policy, in conjunction with the policy that the Assignment Manager assigned five claims for each day a claims representative was out of the office, created an inequitable division of work and caused plaintiffs' performance scores to be unrepresentative of their actual performance.  Because of their long tenure with Farmers, plaintiffs had earned 35 days of vacation per year.  Although the record is not clear as to how many days of vacation each plaintiff took during 2010, it is undisputed that each took days off from work for vacation during 2010.  In fact, Samuelson generally took a week-long vacation each quarter of the year.  Plaintiffs attribute their performance problems to the fact that they were not able to keep up with the backlog of claims that accumulated while they were out of the office on vacation.

Both plaintiffs received indications that their performance was declining.  Samuelson received a counseling memo in May 2010, which explained that her year-to-date TFQ percentage of 86.7% was below the objective of 93%.  It identified the problems with Samuelson's performance between January 2010 and April 2010 and created an action plan designed to cure those deficiencies.  Samuelson contested this memo with Benoit (her supervisor at the time), stating that she had been on vacation and was trying to get caught up.  The problem continued throughout 2010.  In June 2010 Samuelson received a formal

---

than the 2009 year-end review but less negative than the 2010 year-end review.  She received a total score of Partially Meets Expectations.

warning memo, which explained that two additional audits were performed on her files in May, and more deficiencies were found. In August 2010 Samuelson received another formal warning memo. The memo noted that Samuelson's audited files met the TFQ objective during June and August but not during July. That same month Samuelson spoke again to Benoit and asked that her claims volume be reduced. After Davis-Peace assumed the role as Samuelson's supervisor, Samuelson complained to her as well. In early 2011 she also complained to the Human Resources Department and was told to speak with Hemry. She did, and Hemry denied her request to reduce her work volume, telling her that she simply needed "to meet company goals." Ps. App. 10.

On several occasions near the end of March 2011, Davis-Peace asked Samuelson about her plans for retirement. These inquiries continued after Samuelson told her that she had no plans to retire. Around the same time, Samuelson requested that she be moved to a new position, but Davis-Peace told her that she could not be moved because she was on probation. On April 15, 2011 Hemry terminated Samuelson, telling her to "go home, draw unemployment, and enjoy [her] grandkids," and "thank you for training people while you were on probation." *Id*.

Duff was placed on an action plan in October 2010 because her Customer Service percentage of 80.33% did not meet the company's objective of 91%. By the end of 2010, Duff had raised her percentage to 87.11% but was still under the objective. Near the end of 2010, Duff expressed to Hemry her concern regarding the workload and vacation issue, but she was not offered any leniency or solution to the problem. In January 2011 Duff received

a counseling memo highlighting her failure to meet company expectations.  The following month she received a formal warning memo, which noted that her Customer Service percentage was 79% (below the 91% objective) and her Medicare Compliance percentage was 85% (below the 95% objective).  The concluding paragraph stated:

> At this time you are being placed on Formal Warning for a period of 30 days due to your performance.  Within the next 30 days you must make significant improvement in all 2011 objectives, and achieve and maintain a [m]eets or greater in all 2011 objectives.  Failure to meet these standards may result in further disciplinary action, up to and including termination.

Ps. App. 193 (alteration added).

Duff increased her Customer Service percentage to 84.72% over the next 30 days, but she was placed on probation in late March 2011 because it was still below the 91% objective.  She was told that she had another 30 days to achieve a Meets Expectation percentage, but by the end of the 30-day window, it was only 87.7%.  She was terminated on April 20, 2011.  That same day she received an award because a customer had submitted a letter praising her customer service.

In March 2011—approximately one month before plaintiffs were terminated—Hemry created a "triage" position that was designed to address inequitable assignment volume.  The Assignment Manager would no longer be used, and a human would be in charge of distributing claims.  Then in October 2011—approximately six months after plaintiffs' terminations—the Customer Service score was removed as a stand-alone objective and subsumed by the Behavior score.  In early 2012 Hemry was demoted from his managerial

position, and, as of December 2013, he works as a "vendor manager" and does not have anyone directly reporting to him.

Plaintiffs filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 20, 2011, and the EEOC issued notices of dismissal and right-to-sue letters on the same day.  Plaintiffs cannot recall the specific date on which they received these letters.  On October 19, 2011 the EEOC issued plaintiffs a notice of intent to reconsider, revoking the previously issued right-to-sue letters.  Plaintiffs cannot recall the specific date they received this notice, but their counsel was informed via telephone on October 19, 2011.  Plaintiffs' counsel received the letters in the mail the following day on October 20, 2011 in an envelope postmarked October 19, 2011.

Plaintiffs filed suit on May 31, 2012, alleging age discrimination, in violation of the ADEA and TCHRA.  Farmers moves for summary judgment, contending that plaintiffs' failure to file suit within 90 days of the EEOC's initial notice of dismissal causes the ADEA claim to fail as a matter of law, that plaintiffs cannot establish a prima facie case of age discrimination, and that plaintiffs have not produced evidence sufficient to enable a reasonable trier of fact to find that Farmers' proffered legitimate, nondiscriminatory reason for plaintiffs' terminations is pretextual.  Plaintiffs oppose the motion.

II

Because limitations is an affirmative defense and not an element of plaintiffs' cause of action,[7] Farmers has the burden of proof on this defense.  To obtain summary judgment on its defense of limitations, Farmers must establish "beyond peradventure all of the essential elements of the . . . defense."  *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).

Because plaintiffs will bear the burden of proof on their claims for age discrimination under the ADEA and TCHRA, Farmers can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support the claim in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once Farmers does so, plaintiffs must go beyond their pleadings and designate specific facts showing that there is a genuine issue for trial.  *Id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).  An issue is genuine if the evidence is such that a reasonable trier of fact could return a verdict in plaintiffs' favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Plaintiffs' failure to produce proof as to any essential element of a claim renders all other facts immaterial.  *TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D.

---

[7]*See, e.g., Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003) (characterizing as affirmative defense assertion that Americans with Disabilities claim was untimely); *Sivertson v. Clinton*, 2012 WL 4473121, at *2-3 (N.D. Tex. Sept. 28, 2012) (Fitzwater, C.J.) (characterizing as affirmative defense the assertion that claim brought under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, was untimely).

Tex. 2007) (Fitzwater, J.).  Summary judgment is mandatory if plaintiffs fail to meet this burden.  *Little*, 37 F.3d at 1076.

### III

Farmers moves for summary judgment on plaintiffs' ADEA claim[8] on the ground that the claim is time-barred.[9]

### A

In deferral states such as Texas, an aggrieved party must file a charge of discrimination with the EEOC within 300 days after the alleged unlawful practice occurred.  *See* 29 U.S.C. § 626(d)(1)(B); *see also Clark v. Resistoflex Co.*, 854 F.2d 762, 765 (5th Cir. 1988).  "[I]f the EEOC determines that there is no reasonable cause to believe that an unlawful employment practice has occurred, the EEOC issues a letter informing the aggrieved party that it has the right to sue in federal district court . . . within 90 days of the receipt of the letter."  *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 411 (5th Cir. 2003) (citing 29 C.F.R. § 1601.19(a)).  "A plaintiff alleging employment discrimination must file a civil action no more than ninety days after she receives statutory notice of her right to sue from the EEOC.  The ninety-day window is strictly construed and is a precondition to filing

---

[8]Farmers does not challenge the timeliness of the TCHRA claim.

[9]Contrary to Farmers' contention, "[t]he ninety-day filing requirement is not a jurisdictional prerequisite, but more akin to a statute of limitations."  *Harris v. Boyd Tunica, Inc.*, 628 F.3d 237, 239 (5th Cir. 2010) (Title VII case) (citing *Espinoza v. Mo. Pac. R.R. Co.*, 754 F.2d 1247, 1248 n.1 (5th Cir. 1985)).  Although *Harris* is a Title VII case, the same timing requirements apply under both Title VII and the ADEA.  *See, e.g., Mack v. John L. Wortham & Son, L.P.*, 541 Fed. Appx. 348, 355-58 (5th Cir. 2013) (per curiam).

- 12 -

suit in district court." *Smith v. Alcorn State Univ.*, 451 Fed. Appx. 464, 465 (5th Cir. 2011) (per curiam) (quoting *Duron v. Albertson's LLC*, 560 F.3d 288, 290 (5th Cir. 2009) (internal quotation marks omitted)).  "Title 29 of the Code of Federal Regulations § 1601.19(b), allows the EEOC to reconsider its determination." *Martin*, 353 F.3d at 411.  The regulation provides, in pertinent part:

> If the [EEOC] decides to reconsider a final no cause determination, a notice of intent to reconsider shall promptly issue to all parties to the charge.  If such notice of intent to reconsider is issued within 90 days of receipt of the final no cause determination, and the person claiming to be aggrieved . . . has not filed suit and did not request and receive a notice of right to sue pursuant to § 1601.28(a)(1) or (2), the notice of intent to reconsider shall vacate the letter of determination and shall revoke the charging party's right to bring suit within 90 days. . . . After reconsideration, the [EEOC] shall issue a new determination.  In those circumstances where the charging party's right to bring suit in 90 days was revoked, the determination shall include notice that a new 90 day suit period shall begin upon the charging party's receipt of the determination.

29 C.F.R. § 1601.19(b).[10]

Here, it is undisputed that plaintiffs filed their EEOC charges within 300 days of their terminations.  The question presented is whether plaintiffs timely filed suit within the relevant 90-day window.  To answer this question, the court must decide whether the operative dismissal is the EEOC's first right-to-sue letter, which was issued on July 20, 2011, or the second right-to-sue letter, which was issued after the EEOC sent notice of its intent to

---

[10]There is no indication in the record that plaintiffs requested and received a right-to-sue letter pursuant to 29 C.F.R. § 1601.28(a)(1) or (2).

reconsider.  If it is the former, plaintiffs' claims are time-barred because the 90-day period expired on October 21, 2011, and plaintiffs did not file suit until May 31, 2012.  If it is the latter, plaintiffs' claims are timely because they filed suit within 90 days of receiving the EEOC's second right-to-sue letter.

B

Farmers argues that the operative notice of dismissal is the first right-to-sue letter that was issued by the EEOC on July 20, 2011.  Applying the three-day presumption to the issuance of this letter,[11] Farmers argues that the 90-day limitations period began to run on July 23, 2011 (the day on which it is presumed that plaintiffs received the notice) and expired on October 21, 2011.[12]  It contends that because plaintiffs cannot recall the date on which they received the EEOC's notice of intent to reconsider, the same three-day presumption applies to that notice, and since the EEOC's notice of intent to reconsider was postmarked on October 19, 2011, it is presumed that plaintiffs received the notice on October 22, 2011—91 days after the date they are deemed to have received their first right-to-sue letters. According to Farmers, plaintiffs' right to sue expired the day *before* the EEOC revoked it,

---

[11]*See Martin*, 353 F.3d at 411 (applying three-day presumption to plaintiff's receipt of right-to-sue letter); *see also Taylor v. Books A Million, Inc.*, 296 F.3d 376, 379-80 (5th Cir. 2002); *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 148 n.1 (1984) (per curiam) (citing Fed. R. Civ. P. 6(e)).

[12]Plaintiffs agree that the three-day presumption should be applied to determine when they received their initial right-to-sue letters.  They do not dispute that the mailing occurred on July 20, 2011, that it should be deemed that plaintiffs received the letters on July 23, 2011, and that the 90-day period would have expired on October 21, 2011.

- 14 -

and plaintiffs' claim is therefore time-barred.

Plaintiffs respond that the operative notice of dismissal is the second right-to-sue letter that was issued after the EEOC issued its notice of intent to reconsider.  Plaintiffs present two supporting arguments: first, that because the EEOC issued its notice of intent to reconsider within the initial 90-day window, this revoked plaintiffs' right to sue, regardless whether plaintiffs received notice before or after October 21, 2011; and second, that because plaintiffs' counsel received the EEOC's notice of intent to reconsider on October 20, 2011, the receipt by their counsel can be imputed to them, thereby rebutting the three-day presumption.  Under this theory, plaintiffs' counsel received the notice before the initial 90-day window expired, and plaintiffs' right to sue was revoked that same day, making the second right-to-sue letter the operative dismissal.

Although neither party cites the case, *Martin* squarely resolves this issue.  Although *Martin* involved a different procedural posture, the panel was presented with the question how to interpret the word "issued" in 29 C.F.R. § 1601.19(b), which is the same regulation that applies in this case.  *See Martin*, 353 F.3d at 412.  Reasoning that the ordinary meaning of "issued" means the "circulation or distribution of the Notice of Intent To Reconsider by the EEOC," the panel held that "the date that the notice [is] 'issued' . . . is the date on which the notice [is] deposited in the mail by the EEOC."  *Id.* at 413.  It then explained that the district court erred by applying the three-day presumption to determine when the plaintiff received the notice, and that it should have determined that the notice of intent was issued on the day it was *postmarked*—not the day it was received.  *Id.*

- 15 -

*Martin* forecloses Farmers' argument.  Farmers implicitly concedes that if the date of postmark is used to determine when the EEOC's notice of intent to reconsider was issued, plaintiffs' claim is timely, because the notice was postmarked on October 19, 2011—within the initial 90-day filing window.  It argues, however, that the date of postmark is not the relevant date because what counts is the date the charging party received the notice—not the date of issuance by the EEOC.  The *Martin* court plainly rejected this position.  *Id.* at 412-13.

In its reply brief, Farmers cites two cases and argues that this case law "contradicts" this interpretation of 29 C.F.R. § 1601.19(b).  D. Reply 12.  The court disagrees.  In *Gonzalez v. Firestone Tire & Rubber Co.*, 610 F.2d 241 (5th Cir. 1980), the Fifth Circuit stated that "[t]he EEOC may issue a second ninety-day right-to-sue notice upon . . . reconsideration of a prior determination provided *it has given notice* to both parties of its decision to reconsider within the ninety-day period provided by the initial notice of right-to-sue."  *Id.* at 246 (emphasis added).  Contrary to Farmers' suggestion, this language in *Gonzalez* supports rather than undermines plaintiffs' position.  The phrase "it has given notice" refers to an affirmative act on the part of the EEOC, not the "passive act of receipt by the addressee." *See Martin*, 353 F.3d at 413.  Thus *Gonzalez* is consistent with both the result and the panel's reasoning in *Martin*.  *See id.* (reasoning that "issuance" refers to the affirmative act of "putting forth," "distributing," "circulating," or "publishing" on the part of the issuer).  The same is true for *Davidson v. Service Corp. International*, 943 F. Supp. 734 (S.D. Tex. 1996), where the court explained that "the EEOC's authority to revoke a previously issued right to sue notice is limited to . . . situations where the EEOC notifies each party of its intent to

- 16 -

reconsider . . . within ninety days of issuing the [initial] right to sue notice." *Id.* at 739. The court noted in a parenthetical that, under *Gonzalez*, the EEOC can issue a second right-to-sue letter "when a notice of reconsideration *is issued* before the expiration of the original limitations period." *Id.* at 739-40 (emphasis added).

Because the EEOC issued its notice of intent to reconsider on October 19, 2011—within 90 days of issuing the first right-to-sue letters—plaintiffs' right to sue was revoked before they filed suit. Accordingly, the operative dismissal in this case is the EEOC's second right-to-sue letter. It is undisputed that plaintiffs filed suit within 90 days of receiving the second letter. The court therefore holds that plaintiffs' ADEA claim is timely, and that Farmers is not entitled to summary judgment on its limitations defense.[13]

IV

Farmers moves for summary judgment on the merits, contending that plaintiffs cannot establish a prima facie case of age discrimination, and that they cannot create a genuine issue of material fact regarding whether Farmers' proffered legitimate, nondiscriminatory reason for terminating plaintiffs is pretextual.

---

[13]Because the court is denying Farmers' motion for summary judgment on this ground, it does not reach plaintiffs' alternative argument that their counsel's receipt of the EEOC's notice of intent to reconsider can be imputed to them.

A

It is unlawful under the ADEA "to discharge any individual . . . because of such individual's age."[14] 29 U.S.C. § 623(a)(1).  To prove age discrimination, plaintiffs can rely on direct or circumstantial evidence.  *See, e.g., Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005) ("We have traditionally bifurcated ADEA cases into distinct groups: those in which the plaintiff relies upon direct evidence to establish his case of age discrimination, and those in which the plaintiff relies upon purely circumstantial evidence.").  Because plaintiffs are relying on circumstantial evidence, they must establish discrimination using the "modified *McDonnell Douglas* approach."[15]  *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).

As modified, *McDonnell Douglas* consists of three stages.  First, plaintiffs must

---

[14]Although plaintiffs bring their age discrimination claim under both the ADEA and the TCHRA, the court refers only to the ADEA here because the *McDonnell Douglas* burden-shifting framework applies to both claims.  *See, e.g., Munoz v. Seton Healthcare, Inc.*, ___ Fed. Appx. ____, 2014 WL 701509, at *5 (5th Cir. Feb. 18, 2014) (per curiam); *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012).  The only variance, which is discussed more fully below, is that the causation inquiries are different at the final stage of *McDonnell Douglas* under the two statutes.  *See Reed v. Neopost USA, Inc.*, 701 F.3d 434, 440 (5th Cir. 2012).

[15]In *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), the Supreme Court noted that it "has not definitively decided whether the evidentiary framework of *McDonnell Douglas* . . . is appropriate in the ADEA context."  *Id.* at 175 n.2.  The Court relied instead on a textual analysis of the ADEA to resolve the question whether a plaintiff can succeed on a "mixed-motives" claim of age discrimination.  Absent Supreme Court authority, the court will follow the Fifth Circuit's post-*Gross* precedent and apply *McDonnell Douglas* to ADEA cases.  *See, e.g., Chamblee v. Miss. Farm Bureau Fed'n*, ___ Fed. Appx. ____, 2014 WL 31473, at *1-2 (5th Cir. Jan. 6, 2014) (per curiam) (applying *McDonnell Douglas* framework to ADEA claim).

establish a prima facie case of discrimination, which "creates a presumption that [Farmers] unlawfully discriminated against [them]." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).   Second, the burden shifts to Farmers to articulate a legitimate, nondiscriminatory reason for the employment action taken against plaintiffs. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993).   Farmers' burden is one of production, not proof, and involves no credibility assessments. *See, e.g., West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 385 (5th Cir. 2003).   This "burden requires the production of admissible evidence in support of its nondiscriminatory reasons." *Hervey v. Miss. Dep't of Educ.*, 404 Fed. Appx. 865, 868 (5th Cir. 2010) (per curiam) (citing *Burdine*, 450 U.S. at 255).   Third, if Farmers meets its production burden, "the burden shifts back to . . . plaintiff[s] to make an ultimate showing of intentional discrimination." *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012).

At this final stage of the *McDonnell Douglas* framework, the ADEA and the TCHRA involve different causation inquiries.   "Under the ADEA, a plaintiff must prove that age was the 'but for' cause of the challenged adverse employment action." *Id.* at 440 (citing *Moss v. BMC Software, Inc.*, 610 F.3d 917, 928 (5th Cir. 2010); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 167, 173-80 (2009)).   "Under the TCHRA, however, a plaintiff need only show that age was a 'motivating factor' in the defendant's decision." *Id.* (citing *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001); *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 607 (5th Cir. 2007)).

These three steps constitute the *McDonnell Douglas* framework.   "Although

- 19 -

intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 253).

B

Under the *McDonnell Douglas* framework, plaintiffs must first establish a prima facie case of age discrimination. "To establish a prima facie case, a plaintiff need only make a very minimal showing." *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996) (quoting *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 639 (5th Cir. 1985)) (alteration and internal quotation marks omitted). A prima facie case merely raises the inference of discrimination, because the court presumes that the employer's acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 & n.44 (1977); *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). In an age discrimination case, a plaintiff is only required to show that "(1) [she] was discharged; (2) [she] was qualified for the position; (3) [she] was within the protected class at the time of discharge; and (4) [she] was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of [her] age." *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010) (quoting *Berquist v. Wash. Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007)) (internal quotation marks omitted); *but see O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996) (clarifying that age difference must

be "substantial," because an insubstantial age difference does not create the inference that an employment decision was based on an illegal discriminatory criterion).

## C

There is no dispute regarding the first and third elements of the prima facie case. Duff was approximately 51 years old at the time of her termination on April 20, 2011. Samuelson was approximately 55 years old at the time of her termination on April 15, 2011. The remaining questions pertain to the second and fourth elements.

## D

## 1

The court first considers whether plaintiffs have established that they were qualified for their positions. Farmers argues that plaintiffs cannot satisfy this element because neither plaintiff held a college degree, which was required for their positions. This argument lacks force. In *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503 (5th Cir. 1988), the Fifth Circuit explained that "a plaintiff challenging [her] termination . . . can ordinarily establish a prima facie case of age discrimination by showing that [she] continued to possess the necessary qualifications for [her] job at the time of the adverse action." *Bienkowski*, 851 F.2d at 1506. The court clarified in a footnote that it meant by this statement that the "plaintiff had not suffered physical disability or loss of a necessary professional license or some other occurrence that rendered [her] unfit for the position for which [she] was hired." *Id.* at 1506 n.3. It is undisputed that each plaintiff had worked at Farmers for more than 20 years, had been promoted several times, and had worked as a claims representative of some

type (salary grade 31, 32, or 33) since approximately 2000.  There is no evidence in the record that either plaintiff suffered a physical disability, lost a necessary professional license, or was somehow rendered unfit for her position.  Regardless whether they held college degrees, plaintiffs were clearly qualified for their positions on the basis of their experience with the company.  *See, e.g., Stippick v. Stone & Webster Servs., LLC*, 2011 WL 564081, at *6 (S.D. Tex. Feb. 8, 2011) (holding second element satisfied where plaintiff possessed same qualifications on the day demoted as the day hired).  Accordingly, the court holds that plaintiffs have satisfied the second element of the prima facie case.

2

The court next considers whether plaintiffs have established that they were replaced by someone outside the protected class, replaced by someone younger, or otherwise discharged because of their age.  Farmers contends that plaintiffs cannot satisfy this element because they were not replaced by younger employees.  It cites deposition testimony from Duff and Samuelson in which each testified that she did not know whether she had been replaced by someone younger.  In response, plaintiffs do not rely on deposition testimony from Duff or Samuelson.  Rather, they adduce defendants' amended interrogatory responses, where Farmers admits that Candice Taylor (age 28) and Travis Taylor (age 26) were promoted to the position of Special Claims Representative after Duff was terminated, and that Paul Fuentes (age 36) was promoted to Senior Claims Representative after Samuelson was terminated.  In its reply, Farmers argues that this is not evidence that plaintiffs were replaced with younger persons because the relevant interrogatory asked Farmers to identify

- 22 -

each individual who was hired, transferred, *or* promoted to any claims representative position.  It contends that the three individuals identified were merely promoted from within the company and that they did not *replace* plaintiffs because they were not hired from outside the company.

The underlying premise of Farmers' position is that, absent evidence that Farmers actually hired someone from outside the company to fill the positions vacated by plaintiffs, plaintiffs cannot establish the fourth prong of the prima facie case.  The court disagrees with this premise.  In order to establish that they were replaced by persons outside their protected class or younger persons, plaintiffs need not show that Farmers hired persons from outside the organization.  Rather, evidence that Farmers reassigned or promoted other employees to assume plaintiffs' positions is sufficient to establish this prong of the prima facie case.[16]  *See, e.g., Crawford v. Formosa Plastics Corp., La.*, 234 F.3d 899, 902-03 (5th Cir. 2000) (addressing claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*., and ADEA) (noting that plaintiff established element where co-worker from outside the protected class was promoted to plaintiff's vacated position); *Young v. Harris*

---

[16]A plaintiff fails to satisfy this element, however, if the evidence establishes that a current employee simply assumed the responsibilities of the plaintiff's vacated position *in addition to* her current responsibilities.  *See, e.g., Pilcher v. Cont'l Elecs. Corp.*, 121 F.3d 703, 1997 WL 450078, at *4 (5th Cir. July 8, 1997) (per curiam) ("However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work.").  Here, by contrast, Farmers appears to concede that the three individuals identified in their amended interrogatory responses had not been claims representatives before, and that they received increases in salary as a result of the promotions.

*Health Care, Inc.*, 226 F.3d 643, 2000 WL 1029180, at *3 (5th Cir. July 14, 2000) (addressing claims under Title VII and ADEA) (holding that plaintiff established prima facie case where her position was eliminated but her duties were divided into three new positions and assigned to three substantially younger employees); *Pilcher v. Cont'l Elecs. Corp.*, 121 F.3d 703, 1997 WL 450078, at *4 (5th Cir. July 8, 1997) (per curiam) (ADEA case) ("A person is replaced only when another employee is hired *or reassigned* to perform the plaintiff's duties.") (emphasis added)).  Accordingly, the court holds that plaintiffs have satisfied the fourth element of the prima facie case.

E

Because plaintiffs have established all four elements, the court holds that plaintiffs have established a prima facie case of age discrimination.  The burden shifts to Farmers to articulate a legitimate, nondiscriminatory reason for plaintiffs' April 2011 terminations.

V

The court now turns to whether Farmers has met its burden of producing evidence of a legitimate, nondiscriminatory reason for terminating plaintiffs.  Farmers maintains that it terminated plaintiffs due to poor performance, which is a legitimate, nondiscriminatory reason.  *See, e.g., Conaty v. Brocade Commc'n Sys., Inc.*, 2009 WL 937044, at *6 (N.D. Tex. Apr. 7, 2009) (Fitzwater, C.J.) (ADEA case) (holding that noncompliance with performance improvement plan was legitimate, nondiscriminatory reason for terminating employee and that employer had met its burden of production on this basis).

- 24 -

A

Farmers has produced substantial evidence that Duff repeatedly failed to meet Farmers' performance objectives during the period between 2009 and her termination in April 2011. It is undisputed that Duff failed to meet the Customer Service objective in 2009, which was prior to Hemry's arrival and before he introduced changes to the structure of the office or the evaluation system.[17] This performance issue continued throughout 2010. In October 2010 Duff was placed on an action plan because her Customer Service percentage was below the company objective. By the end of the year, although her Customer Service percentage had improved, she was still below the objective. In addition, Duff did not meet the Level of Support objective or Behavior objective in 2010. In January 2011 Duff received a counseling memo highlighting her failure to meet company expectations. The following month she received a formal warning memo, which noted that her Customer Service percentage *and* her Medicare Compliance percentage were below the company objectives. Although her Customer Service percentage improved over the next 30 days, she was placed on probation in late March 2011 because it was still below the objective. She was given another 30 days to achieve a Meets Expectation percentage, but by the end of the 30-day period was still below the company objective. She was terminated on April 20, 2011. Her termination notice cited "performance" as the reason for her termination. Ps. App. 197.

---

[17]During her deposition, Duff admitted that she did not meet this goal in 2009.

B

Farmers has also produced substantial evidence that Samuelson repeatedly failed to meet Farmers' performance objectives during 2010 and the early part of 2011.  It is undisputed that, in May 2010, Samuelson received a counseling memo that explained that her TFQ percentage was below the company objective.  The memo identified this as "an area of concern that needs [Samuelson's] immediate attention."  D. Sealed App. 25.  In June 2010 Samuelson received a formal warning memo that explained that, in May, two additional audits were performed on Samuelson's work and more deficiencies were found with her files.  In August 2010 Samuelson received another formal warning memo.  The memo noted that Samuelson's audited files met the TFQ objective during June and August but not during July.  It extended the formal warning period another 30 days and emphasized that Samuelson's total year-to-end TFQ needed improvement to satisfy the company objective.  On her 2010 year-end performance review, Samuelson received the lowest possible score for TFQ, and an overall rating of Below Expectations.  In one of the comment sections, Davis-Peace noted that Samuelson's "results have not been consistent and have negatively trended."  *Id.* at 34.  In January 2011 Samuelson received another formal warning memo.  The memo explained that Samuelson had 30 days to make significant improvements and 60 days to meet all year-to-date 2011 objectives.  In March 2011 Samuelson received a probation memo, which explained that she was still not meeting two of the five performance objectives (Medicare Compliance and Level of Support).  Samuelson's failure to meet Farmers' objectives continued, and on April 15, 2011 she was terminated.

Based on the evidence discussed above, the court holds that Farmers has met its burden of producing evidence in support of its proffered legitimate, nondiscriminatory reason for terminating plaintiffs.

## VI

The court now considers whether plaintiffs have introduced evidence that would enable a reasonable trier of fact to find that the reason on which Farmers relies is pretextual.

## A

To establish pretext, plaintiffs must show that Farmers' "proffered explanation is false or unworthy of credence." *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011) (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)) (citation and internal quotation marks omitted).  At the summary judgment stage, plaintiffs' burden is to raise a genuine issue of material fact regarding pretext.  *See, e.g., Jackson v. Fed. Express Corp.*, 2006 WL 680471, at *6 (N.D. Tex. Mar. 14, 2006) (Fitzwater, J.) ("Because [defendant] has satisfied its burden to produce a legitimate, nondiscriminatory reason for [plaintiff's] discharge, in order for [plaintiff] to survive summary judgment, he must create a genuine and material fact issue regarding the ultimate question of discrimination.").  And to carry their burden, plaintiffs "must produce substantial evidence of pretext."  *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 402-03 (5th Cir. 2001); *see also id.* at 403 n.3.  Plaintiffs rely on several different types of evidence, and advance a series of arguments, in an attempt to create a genuine issue of material fact on the issue of pretext.

B

Plaintiffs rely on evidence that Farmers discontinued many of the practices that Hemry put in place when he assumed managerial responsibility for the Arlington office. They point to the fact that Hemry created a "triage" position designed to address inequitable assignment volume, that use of the Assignment Manager was subsequently discontinued, and that the more rigid evaluation system implemented under Hemry's leadership was replaced with a more subjective behavior-based evaluation system after plaintiffs were terminated. None of this evidence rebuts Farmers' proffered legitimate, nondiscriminatory reason for terminating plaintiffs. That Farmers changed the way it distributed work or its methods for evaluating its employees would not enable a reasonable trier of fact to find that its reason for terminating plaintiffs—poor performance—was false or unworthy of credence.  Plaintiffs admit that they repeatedly failed to achieve certain specific performance objectives over a prolonged period before they were terminated in April 2011.  Absent evidence that work was being assigned or employees were being evaluated differently because of their age, Farmers' decision to change these internal business practices after April 2011 is not probative of discriminatory intent.  At most, it suggests that Farmers decided that using the Assignment Manager or the more mechanical evaluation system was a mistake.  Such evidence does not create a genuine issue of material fact, however, because it is well established that "even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason.  We do not try in court the validity of good faith beliefs as to an employee's competence.  Motive is the issue." *Little v. Republic Refining Co.*, 924 F.2d 93,

97 (5th Cir. 1991) (ADEA case); *see also Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) (Title VII case) ("The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive."). Consequently, employers can be completely mistaken in their decisions to terminate employees without violating the ADEA.  Federal anti-discrimination laws protect against unlawful discrimination, not against employer mistakes.

C

Plaintiffs next rely on evidence that they generally received positive reviews throughout their tenure with the company, that their supervisors relied on them when they were out of the office, that both plaintiffs received a series of promotions, and that both won awards for their technical proficiency, mentoring abilities, and superior customer service. Farmers does not deny that, at times, plaintiffs performed well in their positions.  Rather, it argues that, although plaintiffs capably performed their jobs at times and in certain respects, their performance in the one- to two-year period before their terminations was poor in particular ways and merited termination.

Plaintiffs' evidence is insufficient to create a genuine issue of material fact.  It is undisputed that both plaintiffs repeatedly failed to achieve certain specific performance criteria during 2010 and early 2011, and that they were repeatedly warned—through counseling memos, formal warning memos, and probation notices—that their jobs were in jeopardy if their performance did not improve.  In particular, it is undisputed that Duff failed to meet the Customer Service objective in 2009—before Hemry's arrival at the office and

before he introduced changes to the structure of the office or the evaluation system.  During 2010 she failed to meet Customer Service, Level of Support, Behavior, and Medicare Compliance objectives at various points throughout the year.  And at the time of her termination in April 2011, Duff's Customer Service objective was still below the company objective.  As for Samuelson, it is undisputed that Samuelson repeatedly failed to meet the TFQ objective throughout 2010, and that she received negative performance reviews from two different supervisors during the period in question—Benoit during the first three quarters of 2010, and Davis-Peace during the fourth quarter of 2010 and early part of 2011.[18]  It is also undisputed that, at the time of her termination, she was still failing to meet at least one of Farmers' performance objectives.  Plaintiffs' evidence that they received positive reviews on other metrics, satisfied different performance objectives, and earned praise, promotions, and awards does not negate the fact that they repeatedly failed to satisfy multiple performance objectives.

D

Plaintiffs also rely on evidence that Flannery, Duff's supervisor, subjectively knew that the requirements imposed by the March 2011 probation memo could not be satisfied within the 30-day period given to Duff to achieve the Customer Service objective.  This

_____

[18]There is also evidence—undisputed by plaintiffs—that when Davis-Peace took over supervisory responsibility for Samuelson in late 2010, she removed the formal warning, but after auditing her files, she reinstated the warning.  The record therefore establishes that two different supervisors independently determined that Samuelson was failing to meet company objectives.

argument lacks force.  The March 2011 probation memo was not the first time Duff was warned that she needed to raise her Customer Service percentage.  Indeed, it was a problem brought to her attention as early as 2009, when she received a Below Expectations score for Customer Service on her year-end review.  That same review included the comment from Flannery that she did not feel the score was representative of Duff's actual customer service performance and that she expected Duff to perform better on this metric the following year. *See* D. Sealed App. 1-2.  But in 2010, contrary to Flannery's stated expectation, Duff failed to meet Farmers' Customer Service objective again.  Farmers repeatedly notified Duff of this problem throughout 2010 and early 2011.  She was placed on an action plan in October 2010, received a counseling memo in January 2011, and received a formal warning memo in February 2011.  That Duff could not raise her Customer Service percentage high enough to satisfy the objective in the final 30-day period before her termination is not probative of discriminatory intent when the record demonstrates that Farmers issued Duff several warnings, starting as early as October 2010.  Moreover, it is undisputed that Duff failed to satisfy other performance objectives—not just Customer Service, but also Medicare Compliance, Level of Support, and Behavior—during the relevant period.

E

Plaintiffs argue that pretext can be inferred from the proximity between Hemry's arrival in April 2010 at the Arlington office and plaintiffs' terminations in April 2011.  This argument fails for two independent reasons.  First, Farmers has adduced undisputed evidence that both plaintiffs failed to meet certain performance objectives *before* Hemry arrived in

April 2010.  As discussed above, Duff failed to satisfy the Customer Service objective on her 2009 year-end review.  Samuelson failed to satisfy the TFQ objective during the period between January 2010 and April 2010.  The record therefore establishes that plaintiffs' performance problems predated Hemry's arrival, which occurred in April 2010.  Second, plaintiffs have failed to present any evidence that Hemry implemented his changes—both in terms of restructuring the office and redesigning the evaluation system—with an intent to discriminate on the basis of age.  Even if the changes introduced by Hemry made it more difficult for plaintiffs to achieve certain performance objectives, absent evidence that the changes were designed to screen out employees based on age, or that similarly situated employees were evaluated differently, this evidence would not permit a reasonable trier of fact to find that Farmers' proffered legitimate, nondiscriminatory reason is pretextual.

F

Plaintiffs also contend that pretext can be inferred from the fact that Farmers treated younger claims representatives differently.  Disparate treatment can create a genuine issue of material fact as to pretext, but plaintiffs "must show that [Farmers] gave preferential treatment to a younger employee under 'nearly identical' circumstances." *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 304 (quoting *Little*, 924 F.2d at 97).  The court concludes that plaintiffs have failed to create a genuine issue of material fact regarding pretext on the basis of disparate treatment.

Plaintiffs' first contention is that the Higher Standards policy was applied to them but not to all of the claims representatives.  They support this assertion with the following

statement: "Please see the following younger individuals who did not meet one of their year-end performance objectives but still received a Total Score of Meets Expectations or higher and were not put on an Action Plan (the list is not exhaustive): Asir Bilal, Anastacia Clark, David Bateman, etc." Ps. Br. 31.  This statement only identifies three purportedly younger individuals to compare.  Plaintiffs cannot rely on their parenthetical and "et cetera" to avoid summary judgment because a court is not obligated to comb the record in search of evidence that will permit a nonmovant to survive summary judgment.  *See, e.g., Arrieta v. Yellow Transp., Inc.*, 2008 WL 5220569, at *2 n.3 (N.D. Tex. Dec. 12, 2008) (Fitzwater, C.J.); *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006).  The only record evidence they cite is three year-end performance reviews, one for each alleged comparator. *See* Ps. Br. 31 n.203.

None of these individuals was similarly situated to plaintiffs, who were Med/PIP claims representatives working in the Arlington office at salary grades of 33 (Duff) and 32 (Samuelson).  Asir Bilal was a subrogation claims representative who worked in the Austin subrogation unit. Ps. App. 148.  His performance assessment is based on a different set of criteria, including Quality Excellence, Availability & Efficiency Excellence, Customer Experience Excellence, and File Quality Consistency—factors not mentioned on any of plaintiffs' performance reviews.  The comments on the review appear to be written by a manager named Clinton Lee ("Lee"), and there is no record evidence that Lee ever supervised plaintiffs. *See id.* at 148-52.  Anastacia Clark ("Clark") was a liability claims representative, and the comments on her review appear to be written by a manager named

Maranda Martin ("Martin").  *See id.* at 153-58.  Again, there is no record evidence that Martin supervised plaintiffs.  Moreover, plaintiffs do not cite any record evidence establishing Clark's age. David Bateman ("Bateman") was a Special Claims Representative working in the Med/PIP unit, and thus shared the same title as Duff, but he was managed by Martin, too.  *See id.* at 159-63.  Plaintiffs likewise fail to cite any record evidence as to Bateman's age.[19]  Finally, none of these purported comparators has a performance review that is "nearly identical" to plaintiffs' performance reviews.  In particular, Farmers has produced substantial evidence that Duff began having performance problems in 2009, which continued until her termination in April 2011, and that Samuelson failed to achieve performance objectives throughout 2010 and early 2011.  Plaintiffs have only adduced a single performance review from 2010 for each comparator, so it is impossible to determine whether problems identified on the cited reviews were ongoing in the same way that plaintiffs' failure to meet performance objectives was ongoing.  Moreover, the cited reviews do not indicate whether any of the comparators were put on action plans; they just evaluate their performance.  Thus the court concludes that plaintiffs have failed to identify a younger employee with a comparable performance history who was treated differently.

Plaintiffs' second contention is that the new teams that Hemry implemented gave a distinct advantage to younger claims representatives.  They contend that the TNT and RLE groups received fewer, less complicated claims, and that it was easier to perform well on

---

[19]During his deposition, Hemry testified that he "guess[ed]" Bateman was "in his mid-40s."  Ps. App. 80.

these teams because of a more equitable workload distribution and more lenient performance-rating criteria.  This argument lacks force.  Farmers has adduced evidence that the TNT and RLE groups were staffed primarily by less-experienced claims representatives with a lower salary grade than plaintiffs, which explains why members of the Floor group were given a higher number of more complicated claims.  There is no evidence that Hemry created these specialized teams in order to discriminate based on age.  In addition, there is no evidence that his decision to evaluate the three teams based on different sets of performance-rating criteria was motivated by discriminatory animus.  During his deposition, Hemry explained why claims representatives in the TNT and RLE groups were evaluated differently with respect to customer service.  He testified that claims representatives in the TNT group were not scored individually on the basis of customer service because they typically did not interact with customers due to the nature of the claims.  He testified that claims representatives in the RLE group were not evaluated on the basis of customer service at all because, for those claims, the claimant is represented by an attorney, and Farmers was not interested in evaluating the service provided to the attorney.  Plaintiffs have failed to present any evidence rebutting either of these legitimate, nondiscriminatory explanations.

In sum, plaintiffs have failed to support their assertion of disparate treatment with competent summary judgment evidence.  They have failed to adduce evidence that Farmers' reason for creating the specialized groups and managing them in this way is pretextual.[20]

---

[20]Relying on *Khanna v. Park Place Motorcars of Houston, Ltd.*, 2000 WL 1801850, at \*4 (N.D. Tex. Dec. 6, 2000) (Fitzwater, J.), plaintiffs argue that this is a case in which

And they have failed to present evidence that Farmers' decision to restructure the office and revise the evaluation system was motivated by discriminatory intent.

G

Plaintiffs next contend that pretext can be inferred from the fact that Farmers has failed to identify the person who made the decision to terminate plaintiffs. They maintain that Farmers first stated that Flannery recommended to Hemry that Duff be terminated, but that this position was rebutted by Flannery during her deposition when she testified that she did not feel as though Duff "deserved" to be terminated. Farmers responds that Hemry made the ultimate decision to terminate Duff and that Flannery's deposition testimony does not rebut that position. The court agrees with Farmers.

Flannery's testimony, when read in context, does not rebut Farmers' legitimate, nondiscriminatory reason. It also does not create a material fact issue as to who ultimately decided to terminate Duff. Flannery testified:

---

plaintiffs were held to higher standards than their peers, and that this disparity is evidence of pretext. But *Khanna* is distinguishable. In that case the plaintiff produced evidence that there were several inconsistencies in sales requirements that the employer imposed on its employees—sales requirements that the employer could not explain but had relied on to justify the plaintiff's termination. *Id.* at *3. Moreover, the plaintiff produced evidence that three similarly situated employees of a different protected class were treated differently. *Id.* at *4. Here, by contrast, there is neither evidence that Farmers' performance-rating criteria were facially inconsistent nor evidence that the evaluation system was applied differently to similarly situated employees in the Arlington Med/PIP office. And Farmers, unlike the defendant in *Khanna*, has explained its reasons for evaluating the different teams in this manner.

| Counsel: | Do you believe Ms. Duff deserved to be terminated? |
|---|---|
| Flannery: | It's tough.  She didn't meet the goal, and that was the goal.  Do I feel like she deserved to be terminated?  No. |
| Counsel: | Do you feel like other employees were given more leniency for not meeting goals? |
| Flannery: | No.  I don't think anybody else was handled any differently.  It was a set number, and if you did not get the number, then you didn't meet the goal. |

Ps. App. 46.  A reasonable trier of fact could not infer from this testimony that Farmers discharged Duff because of her age.  Flannery's testimony reinforces Farmers' proffered legitimate, nondiscriminatory reason because it confirms that Duff failed to meet certain performance criteria.  Although Flannery appears to believe that the evaluation system did not accurately reflect Duff's contributions to the company, she does not suggest that the criteria were pretextual.  And she affirmatively denies that any other claims representative was treated differently.  Thus this evidence fails to create a genuine issue of material fact regarding pretext.

H

Plaintiffs also rely on comments made by Hemry and Davis-Peace near the time of plaintiffs' terminations.  During his termination meeting with Samuelson, Hemry told her that she should "go home, draw unemployment, and enjoy [her] grandkids."  Ps. App. 10.  On several occasions near the end of March 2011, Davis-Peace asked Samuelson about her plans for retirement and continued to make these inquiries after Samuelson informed her that she

had no plans to retire.  Plaintiffs acknowledge that neither comment is direct evidence of intentional discrimination, but they argue that the comments are circumstantial evidence sufficient to raise a genuine issue of material fact that Farmers' reason is pretextual (as to the ADEA claim) or was a motivating factor for Farmers' decision (as to the TCHRA claim). Farmers replies that these comments are insufficient to create a genuine issue of material fact regarding intentional age discrimination.[21]

To qualify as circumstantial evidence of intentional discrimination, a remark must "first, demonstrate discriminatory animus and, second, be made by a person primarily responsible for the adverse employment action or by a person with influence or leverage over the formal decisionmaker."  *Laxton*, 333 F.3d at 583 (citing *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 225 (5th Cir. 2000); *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002)).  The court holds that the second requirement is satisfied as to both Hemry's comment and Davis-Peace's comments because Hemry was the ultimate decision-maker for Samuelson's termination and Davis-Peace was her direct supervisor.  The question is whether the first requirement is satisfied.  Both comments plainly indicate that the speaker was aware of Samuelson's age, but neither comment clearly evinces discriminatory animus.

---

[21]Farmers characterizes these comments as "stray remarks."  Plaintiffs acknowledge that the remarks are merely circumstantial evidence of intentional discrimination, not direct evidence.  Regardless whether these remarks are characterized as "stray remarks," it is clear that when plaintiffs offer comments as circumstantial evidence, the court should apply the two-part test from *Russell v. McKinney Hospital Venture*, 235 F.3d 219, 225-26 (5th Cir. 2000).  *See Reed*, 701 F.3d at 441-42 (noting that when claim is based on circumstantial evidence, district court should apply two-part test of *Russell*, rather than four-part test of *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996)).

The court need not decide whether the comments can be considered circumstantial evidence of discrimination because, even if they are, they are insufficient to create a genuine issue of material fact that would preclude summary judgment.  For example, in *Waggoner v. City of Garland, Texas*, 987 F.2d 1160 (5th Cir. 1993), the Fifth Circuit held that a supervisor's statement that a younger person could do better and faster work and his characterization of the plaintiff as "an old fart" were insufficient to create a genuine issue of material fact as to age discrimination.  *Id.* at 1163, 1166.  The comments in *Waggoner* were a much clearer indication of discriminatory animus than the comments by Hemry and Davis-Peace, but they failed to create a genuine issue of material fact.  Here, not only are the comments less indicative of discriminatory animus, the employer has produced even more evidence in support of its proffered legitimate, nondiscriminatory reason for its decisions to terminate plaintiffs.  Thus the court concludes that these comments are insufficient to create a genuine issue of material fact regarding pretext.

I

Finally, plaintiffs argue that, even if the court determines that the policies implemented by Hemry are facially neutral, they are still discriminatory because they had a disproportionately negative impact on older employees.  In particular, plaintiffs maintain that the combination of Farmers' vacation policy and the new evaluation system worked to the disadvantage of older, more tenured employees such as plaintiffs.  Farmers replies that plaintiffs should not be allowed to recast their disparate treatment claim as a disparate impact claim because they did not plead a disparate impact claim.  It also contends that, even if

plaintiffs had pleaded a disparate impact claim, it was not administratively exhausted, or, alternatively, it fails as a matter of law because plaintiffs have not produced statistical evidence necessary to establish disparate impact discrimination.

The court holds that plaintiffs did not plead a disparate impact theory of discrimination and thus cannot rely on this basis to preclude summary judgment. "A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) (citation omitted); *see also Ellis v. Crawford*, 2007 WL 1624773, at *11 (N.D. Tex. June 6, 2007) (Fitzwater, J.) (holding that plaintiffs could not rely on unpleaded hostile work environment claim raised for the first time in summary judgment response) (citing *Cutrera*, 429 F.3d at 113). "A properly pleaded complaint must give 'fair notice of what the claim is and the grounds upon which it rests.'" *De Franceschi v. BAC Home Loans Servicing, L.P.*, 477 Fed. Appx. 200, 204 (5th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 698-99 (2009)). "Accordingly, district courts do not abuse their discretion when they disregard claims or theories of liability not present in the complaint and raised first in a motion opposing summary judgment." *Id.* In their complaint, plaintiffs allege that "[Farmers] fired Plaintiffs in a *deliberate attempt* by management to make the overall workforce younger. [Farmers] terminated Plaintiffs because of their age." Compl. ¶ 23 (emphasis added); *see also id.* ¶ 27 ("[Farmers'] actions, including but not limited to the ultimate terminations of Plaintiffs, were undertaken because of Plaintiffs' age."). The complaint does not give fair notice that plaintiffs' age

discrimination claim is based on a disparate impact theory. The court's conclusion is reinforced by the fact that plaintiffs' response brief does not address the elements of a disparate impact claim and does not present any statistical evidence about the effect of Farmers' policies. *See Muñoz v. Orr*, 200 F.3d 291, 299-300 (5th Cir. 2000) (Title VII case) (discussing differences between proof necessary for disparate treatment claim and disparate impact claim). Accordingly, the court holds that plaintiffs cannot avoid summary judgment on this basis.[22]

J

In sum, plaintiffs have not presented evidence that would permit a reasonable trier of fact to find that Farmers' legitimate, nondiscriminatory reason is pretextual. Even viewing the evidence in the light most favorable to plaintiffs and drawing all reasonable inferences in their favor, there is abundant and uncontroverted evidence that no discrimination occurred. *See Smith v. Hewlett-Packard Co.*, 512 F.Supp.2d 587, 601-02 (N.D. Tex. 2007) (Fitzwater, J.) (noting that summary judgment is appropriate where there is a "weak issue of fact" and "abundant and uncontroverted evidence that no discrimination occurred"). Plaintiffs admitted that they failed to satisfy certain performance criteria during the one- to two-year period leading up to their terminations in April 2011. They attribute their poor performance to a variety of factors—a restructured office, a more mechanical evaluation system,

---

[22]Because the court is granting Farmers' motion for summary judgment on this ground, it does not reach Farmers' alternative arguments about whether plaintiffs administratively exhausted a disparate impact claim and whether plaintiffs have produced evidence sufficient to establish a disparate impact claim.

inequitable workload distribution—but they have presented no evidence that other claims

representatives in their position were treated differently.  At most, plaintiffs have produced

evidence that the changes introduced by Hemry were misguided, but they have not presented

sufficient evidence from which a reasonable trier of fact could find that those changes were

discriminatory.  Assuming *arguendo* that the comments by Hemry and Davis-Peace about

Samuelson's grandchildren and her plans for retirement can be considered circumstantial

evidence of discriminatory animus, it is weak evidence, and plaintiffs have failed to show

any meaningful connection between these comments and the decisions to discharge them.

Thus the court concludes that plaintiffs have failed to adduce evidence that would permit a

reasonable trier of fact to find that Farmers' legitimate, nondiscriminatory reason is

pretextual.  Accordingly, Farmers is entitled to summary judgment dismissing plaintiffs' age

discrimination claim under the ADEA.

VII

The court now decides whether plaintiffs have introduced evidence that would enable

a reasonable trier of fact to find that age was a motivating factor for Farmers' decision, i.e.,

whether they can recover under the TCHRA for age discrimination.

A

As discussed above, plaintiffs can avoid summary judgment on their TCHRA claim

by showing that age was a "motivating factor" in Farmers' decision.  *See Reed*, 701 F.3d at

440; *Quantum*, 47 S.W.3d at 480.  Plaintiffs do not raise any argument that the court should

evaluate their claim based on a mixed-motives theory.[23]  They rely on the same evidence and arguments, previously discussed, that Farmers' proffered legitimate, nondiscriminatory reason is pretextual.  They emphasize that even if the comments by Hemry and Davis-Peace do not satisfy their burden of causation under the ADEA, the comments are at least sufficient to create a genuine issue of material fact that Samuelson's age was a motivating factor for Farmers' decision to terminate her.  Farmers does not specifically respond to this argument and fails to address the causation standard under the TCHRA.[24]

B

The court holds that the comments by Hemry and Davis-Peace are insufficient to create a genuine issue of material fact that age was a motivating factor in Farmers' decision.  The record is replete with evidence that plaintiffs repeatedly failed to satisfy certain performance objectives during the one- to two-year period before their terminations.  Plaintiffs concede as much.  *See, e.g.,* Ps. Br. 10 ("This would be a recurring issue for Ms.

---

[23]That plaintiffs failed to respond by urging a mixed-motives theory is not dispositive. In *Quantum* the Supreme Court of Texas held that the "motivating factor" causation standard applies to all claims brought under the TCHRA—those based on pretext and mixed-motives theories alike.  *See Quantum*, 47 S.W.3d at 479-80.

[24]Farmers argues that because Samuelson does not allege that Davis-Peace discriminated against her, Davis-Peace's comments are irrelevant.  The court disagrees. Comments by a direct supervisor can be probative as to the employer's reason for the adverse employment decision even if the plaintiff does not subjectively believe that the supervisor discriminated against her.  *Cf. Russell*, 235 F.3d at 226-27; *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 593 (Tex. 2008) (applying *Russell* in context of TCHRA claim).  Although the court ultimately concludes that Davis-Peace's comments are insufficient to create a genuine issue of material fact, the court deems them to be relevant.

Samuelson as she took her quarterly vacations, leading to performance that met goals and then at times would not."), 13 ("Ms. Duff's Level of Support and Behavior scores did not 'Meet Expectations' in 2010 because Ms. Duff did not 'Meet Expectations' on her customer service goal and because she had been placed on an action plan due to the customer service issue."). In fact, they contend that plaintiffs' negative performance reviews were caused in part by their taking vacation and not being in the office enough to remain current with their work. Farmers' proffered legitimate, nondiscriminatory reason for plaintiffs' terminations—poor performance—comports with plaintiffs' own explanation for their negative performance reviews. And given that it is undisputed that plaintiffs failed to satisfy certain performance objectives over a prolonged period, a reasonable trier of fact could not infer based on Hemry's and Davis-Peace's comments that age was a motivating factor in the decision to terminate plaintiffs.

In sum, the court concludes that a series of age-related comments that do not clearly evince discriminatory animus are insufficient to create a genuine issue for trial where (1) plaintiffs have effectively conceded the underlying justification for the adverse employment action; (2) there is substantial, uncontroverted evidence supporting that same justification; and (3) it is undisputed that plaintiffs were given several opportunities to improve their performance and avoid the adverse employment action. *See Martin v. Bayland Inc.*, 403 F.Supp.2d 578, 586 (S.D. Tex. 2005) (granting summary judgment to employer on TCHRA claim where plaintiff failed to create genuine issue of material fact that employer's reason was false and produced only a scintilla of evidence as to age discrimination), *aff'd*, 181 Fed.

Appx. 422, 426 (5th Cir. 2006) (noting that "it's time to retire" remark and "other innocuous

retirement references" were insufficient to create genuine issue of material fact).  As a result,

even under this lower causation threshold, plaintiffs have failed to create a genuine issue of

material fact regarding whether their age was a motivating factor in Farmers' decisions to

terminate them.  Accordingly, Farmers is entitled to summary judgment on plaintiffs'

TCHRA claim.

*   *   *

For the reasons explained, the court grants defendant's motion for summary judgment

and dismisses this action with prejudice by judgment filed today.[25]

**SO ORDERED.**

April 21, 2014.

SIDNEY A. FITZWATER
CHIEF JUDGE

---

[25]In its motion, Farmers requests in cursory fashion that it be awarded attorney's fees
and costs.  It does not identify a basis for this request or support the assertion in any other
way.  The court denies this request.